**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, Appellant,**

**v.**

**MFA MUTUAL INSURANCE COMPANY, a corporation, Respondent.**

No. 55914.

Supreme Court of Missouri, En Banc.

Oct. 9, 1972.

Harold D. Jones, Bock & Jones, New Madrid, for appellant State Farm Mut. Auto. Ins. Co.

Edward F. Friedewald, Wangelin & Friedewald, Poplar Bluff, for respondent MFA Mut. Ins. Co.

PER CURIAM.

This case reached this court by way of transfer pursuant to Article V, § 10, Constitution of Missouri, and Civil Rule 84.05(a) (now Rule 83.03), V.A.M.R.

This action for a declaratory judgment [1] was instituted by State Farm Mutual Automobile Insurance Company (State Farm) in the Circuit Court of Butler County against Sue Smart (Smart), Harold Lee Hisaw, Sr. (Hisaw), and MFA Mutual Insurance Company (MFA) to ascertain the liability of the two insurers in a damage suit brought by Smart against Hisaw following an accident which occurred in Poplar Bluff on November 20, 1964. The circuit court declared that State Farm was solely responsible for the defense of Hisaw in the damage suit and was obligated, by reason of an agreement between it and MFA, to reimburse MFA the $4,000 MFA had paid to Smart in settlement of her demands in the tort case.

State Farm appealed to the Springfield Court of Appeals (now The Missouri Court of Appeals, Springfield District) where the

judgment was affirmed in an opinion by Titus, P. J. Supplemental briefs were filed in this court after the transfer. Thereafter, the case was argued by counsel and submitted. We reach the same general result reached by the court of appeals. In doing so, we adopt as the opinion of this court the major part of the opinion filed in the court of appeals.

MFA had issued an automobile liability insurance policy to Gordie White (White) wherein the described automobile was a 1961 Rambler. This contract, inter alia, insured White and his permittees against bodily injury and property damage liability "caused by accident and arising out of the ownership, maintenance, or use of the described automobile." The policy additionally furnished "Automatic Insurance For Newly Acquired Automobiles" by providing that "The insurance afforded by this policy with respect to the described automobile applies to any other automobile of which the named insured or spouse acquires ownership if it replaces the described automobile . . .."

State Farm, by its policy issued to Hisaw, insured Hisaw, among other things, against liability for bodily injury and property damage while he was driving an automobile owned by another. State Farm's contract stipulated, however, that "The insurance with respect to a . . . non-owned automobile shall be excess over other collectible insurance."

The trial court determined this action upon an agreed statement of facts wherein it was stipulated that at the time of the November 20, 1964, accident, Hisaw was driving a 1958 Ford pickup truck with the permission of White. State Farm contends (as it did in the Circuit Court) that the Ford was a replacement of the Rambler automobile described in MFA's policy issued to White and that by reason of the provision for "Automatic Insurance For Newly Acquired Automobiles" contained in MFA's

---

1. Rule 87.01, et seq.; § 527.010, et seq. All references herein to rules and statutes are to Missouri Supreme Court Rules of Civil Procedure, V.A.M.R., and to RSMo 1969, V.A.M.S.

policy, MFA's contract afforded primary coverage to Hisaw. State Farm additionally asserts that MFA, because of its conduct noted anon, was estopped to deny liability coverage to Hisaw.

The Missouri certificate of title to the Ford pickup involved in the accident had initially been issued to one W. H. Davis who later made an "Assignment of Title" to Bluff City Motors, a registered dealer. Subsequently, Bluff City Motors, by duly executing and acknowledging before a notary public the "Reassignment By Registered Dealer Only" form on the certificate and by delivering the certificate, transferred ownership of the truck to Howard Selvidge Auto Company (Selvidge), also a registered dealer. On November 16, 1964, White gave the 1961 Rambler described in MFA's policy to Selvidge on an even trade ("no money involved") for the Ford pickup and received in exchange possession of the truck, a copy of a "Used Car Order",[2] and the certificate of title to the Ford. The certificate bore another form entitled: "To Be Used By Registered Dealer Only When Previous Reassignment On Title Is Made To 'Selling' Registered Dealer—Reassignment By Registered Dealer." White's name was inserted in this form as the transferee and it was signed by Selvidge, but the assignment was not dated and Selvidge's signature was never acknowledged before or by a notary public as required by the form. The parties

stipulated that because the transaction occurred "at night" when a notary public was not available,. White was advised to take the certificate to a designated "notary public who did all of Selvidge's acknowledgments . . . and that she would 'notarize' or acknowledge the signature of Selvidge for White; but White failed to do so." After White obtained possession of the Ford he attached to it the Missouri license plate previously issued to him for the Rambler. White never made application for a title to the pickup. "On December 12, 1964, [following the accident of November 20, 1964] Hisaw purchased the . . . . Ford pick-up from White and because White had not registered it, White and Hisaw had Selvidge execute another 'Reassignment By Registered Dealer' to Hisaw." Hisaw thereafter applied for and was issued a certificate of title to the Ford pickup by the director of revenue.

We are unsure of the intendment of State Farm's bifurcated asseveration designed to induce a finding that the Ford pickup was a "newly acquired automobile" and thereby primarily covered by MFA's insurance policy issued to White. One tine of the argument points toward an assertion that White acquired "ownership" of the Ford because the provisions of § 301.200 [3] "covering sales by dealers does not contain the strict requirements set out in § 301.210;"[4] the other tine, with a

---

2. This apparently is a form devised by the dealer as it is not a form prescribed by either the statutes or the director of revenue regulating the sale or transfer of used motor vehicles.

3. § 301.200: "1. In the case of dealers, a separate certificate of ownership, either of such dealer's immediate vendor, or of the dealer himself, shall be required in the case of each motor vehicle in his possession, and the director of revenue shall determine the form in which application for such certificates of ownership. and assignments shall be made, in case forms differing from those used for individuals are, in his judgment, reasonably required; provided, however, that no such certificates shall be required in the case of

new motor vehicles or trailers sold by manufacturers to dealers. 2. Dealers shall execute and deliver bills of sale in accordance with forms prescribed by the director of revenue for all new cars sold by them. On the presentation of a bill of sale, executed in the form prescribed by the director of revenue, by a manufacturer or a dealer for a new car sold in this state, a certificate of ownership shall be issued."

4. Pertinent parts of § 301.210 state: "1. In the event of a sale or transfer of ownership of a motor vehicle . . . for which a certificate of ownership has been issued the holder of such certificate shall indorse on the same an assignment thereof, with warranty of title in form

contradictory thrust, directs us to the sweeping conclusion "that for liability coverage, as contrasted to property coverage, it is unnecessary to have an insurable interest [i. e., ownership] in the automobile." The fallacy in the first portion of this argument is that Subsec. 2 of § 301.200 (quoted marginally) applies only to the sale by dealers of new automobiles or those for which a certificate of ownership has never been issued,[5] and Subsec. 1 of § 301.200 (quoted marginally) has nothing to do with the sale or transfer of motor vehicles from a dealer to an individual. The Ford pickup truck which concerns us was a used motor vehicle or one for which a certificate of ownership had been issued before it came into the possession of dealer Selvidge. Buyers of used automobiles who are not registered dealers are required by Subsec. 2 of § 301.210 to present the certificate of ownership assigned to them to the director of revenue and obtain a new certificate. "However, in the case of dealers, the statutory requirement [of Subsec. 1 of § 301.-200] is only that a dealer must [for every used motor vehicle in his possession] have 'a separate certificate of ownership, either of such dealer's immediate vendor, or of the dealer himself' . . . so that when a dealer is the buyer [of a used automobile], while he must take an assignment di-

rectly to himself, he may make a reassignment direct to his vendee without getting a new title certificate in his own name as required in the case of sales between individuals." Pearl v. Interstate Securities Co., 357 Mo. (banc) 160, 164–165, 206 S.W. 2d 975, 978.

The sale or transfer of used motor vehicles or those "for which a certificate of ownership has been issued," is governed by § 301.210 (heretofore quoted marginally). Stephen Burns, Inc. v. Trantham, Mo.App., 305 S.W.2d 66, 69; Vetter v. Browne, 231 Mo.App. 1147, 1150, 85 S.W.2d 197, 198. It has been repeatedly held, by reason of § 301.210, that even though accompanied by full payment and physical delivery of possession, the attempted sale of a used automobile is fraudulent and void and passes no title whatever, legal or equitable [Kelso v. Kelso, Mo., 306 S.W.2d 534, 538(5), 71 A. L.R.2d 258, 265(4); Robertson v. Central Manufacturers' Mut. Ins. Co., 239 Mo.App. 1169, 1174(1), 207 S.W.2d 59, 61(1)], unless, as a reasonably contemporaneous part of the transaction, the previously issued certificate of ownership with a properly completed and acknowledged assignment thereof by the seller is delivered to the buyer,[6] and this is so whether the purported sale be from one non-dealer to another[7]

printed thereon, and prescribed by the director of revenue . . . and deliver the same to the buyer at the time of the delivery to him of said motor vehicle . . . . 4. It shall be unlawful for any person to buy or sell in this state any motor vehicle . . . registered under the laws of this state, unless at the time of the delivery thereof, there shall pass between the parties such certificate of ownership with an assignment thereof, as herein provided, and the sale of any motor vehicle . . . registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void."

5. Consolidated Underwriters v. Pennsylvania T. & F. Mut. Cas. Ins. Co., 8 Cir., 324 F.2d 21, 23; Federated Mutual Imp. & Hardware Ins. Co. v. M.F.A. Mut. Ins. Co., W.D.Mo., 211 F.Supp. 247, 249, 250(2); Galemore v. Mid-West National Fire & Cas. Ins. Co., Mo.App.,

443 S.W.2d 194, 197–198; Inland Discount Corp. v. St. Louis Auto Auction Barn, Mo.App., 303 S.W.2d 185, 187(1); Mallory Motor Company v. Overall, Mo. App., 279 S.W.2d 532, 534.

6. Greer v. Zurich Insurance Company, Mo., 441 S.W.2d 15, 25(5); Still v. Travelers Indemnity Company, Mo., 374 S.W.2d 95, 99(1); McIntosh v. White, Mo.App., 447 S.W.2d 75, 80(13); Galati v. New Amsterdam Casualty Company, Mo.App., 381 S.W.2d 5, 7(1); Bordman Invest. Co. v. Peoples Bank of Kansas City, Mo.App., 320 S.W.2d 72, 78(7).

7. State v. Glenn, Mo., 423 S.W.2d 770, 774(1–3); State ex rel. Connecticut Fire Ins. Co. of Hartford, Conn. v. Cox, 306 Mo. 537, 552, 268 S.W. 87, 90(3), 37 A.L.R. 1456, 1464; Public Finance Corp. of Kansas City v. Shemwell, Mo.App., 345 S.W.2d 494, 497–498(2); Haynes v. Linder, Mo.App., 323 S.W.2d 505, 511(10).

or from a dealer to an individual.[8] Although the provisions of § 301.210 which require that there be an assignment of the certificate of ownership "in form printed thereon, and prescribed by the director of revenue," do not specify that there be an acknowledgment of the assignment by the seller before a notary public, it has been ruled that the statute is broad enough to authorize the director to require such an acknowledgment and that an unacknowledged assignment is insufficient to vest title or ownership in the purported buyer.[9]

■ In applicable instances, "The ownership of an autmobile is irrelevant to the validity of an insurance policy covering *only* liability for bodily injuries and property damages" [State Farm Mut. Auto. Ins. Co. v. Central Sur. & I. Corp., Mo.App., 405 S.W.2d 530, 534(3)],[10] but that principle is not germane to the circumstances in this case or under the terms of the involved insurance contract. Since Hisaw (driver of the Ford) was not the named insured in the policy that MFA issued to White, in order for Hisaw to be a person insured by MFA it was required that he be using the vehicle described in that policy "with the permission of the named insured," White. Also, in order that the coverage afforded by MFA "with respect to the described automobile" be applied to a "newly acquired automobile," it was necessary that the latter vehicle be an "automobile of which the named insured or spouse acquires ownership if it replaces the described automobile . . . ." Therefore, whether or not at the time of the accident MFA's policy afforded coverage to the permittee-driver of the Ford pickup as a "newly acquired automobile" depended upon whether or not White, the named insured, had acquired ownership of that truck (Moore v. State Farm Mutual Automobile Ins. Co., supra, 381 S.W.2d at 164), or as stated in Beck Motors, Inc. v. Federal Mutual Insurance Co., Mo.App., 443 S.W.2d 200, 203 (quoting State Farm Mutual Automobile Ins. Co. v. Shaffer, 250 N.C. 45, 108 S.E.2d 49, 54), "It is our opinion that the replacement vehicle is one *the ownership of which* has been acquired after the issuance of the policy." (Our emphasis). "[A] prerequisite under the automatic coverage provision is that the named insured own the new vehicle,"[11] and the word "ownership" as used in the contract must be construed in connection with the provisions of § 301.210 which establish the

8. Sabella v. American Indemnity Company, Mo.(banc), 372 S.W.2d 36, 40(2); Citizens Discount & Investment Corp. v. Wood, Mo.App., 435 S.W.2d 717, 721 (1); Ferm v. Miller Pontiac Company, Mo.App., 407 S.W.2d 55, 57–58(2); Moore v. State Farm Mutual Automobile Ins. Co., Mo.App., 381 S.W.2d 161, 164–165(1, 2); Allstate Insurance Co. v. Hartford Accident & Ind. Co., Mo.App., 311 S.W.2d 41, 46(3).

9. Pearl v. Interstate Securities Co., supra, 206 S.W.2d at 978(9–10); Peper v. American Exchange Nat. Bank in St. Louis, 357 Mo. 652, 657, 210 S.W.2d 41, 44(2); Commercial Credit Corporation v. Blau, Mo., 393 S.W.2d 558, 563(1–2); Kahn v. Lockhart, Mo.App., 392 S.W.2d 30, 34, 36, 37(7); Wills v. Shepherd, 241 Mo.App. 102, 231 S.W.2d 843, 846.

10. E. g. Under an omnibus clause affording protection to any person using the described vehicle with permission of the named insured—Western Casualty & Surety Co. v. Herman, 8 Cir., 318 F.2d 50, 1 A.L.R.3d 1184; Sabella v. American Indemnity Co., supra, Mo., 372 S.W.2d 36; Haynes v. Linder, supra, Mo.App., 323 S.W.2d 505; Dealer under automobile sales and service policy insuring any automobile "in charge of named insured"—Kahn v. Lockhart, supra, Mo.App., 392 S.W.2d 30: Named insured under policy insuring against liability instead of loss—Hall v. Weston, Mo., 323 S.W.2d 673; Named insured operating a non-owned or temporary substitute automobile—Linenschmidt v. Continental Casualty Co., 356 Mo. 914, 204 S.W.2d 295; Bivins v. Ace Wrecking & Excavating Co., Mo., 409 S.W.2d 97.

11. Hopkins v. Martinez, 73 N.M. 275, 387 P.2d 852, 855(6); and cases there cited; Robinson v. Georgia Casualty & Surety Co., 235 S.C. 178, 110 S.E.2d 255, 261; 45 C.J.S. Insurance § 829, at p. 888; 12 Couch on Insurance 2d § 45:187, p. 237; 7 Appleman, Insurance Law & Practice, § 4293, at pp. 91–92.

requirements of proof of ownership for used motor vehicles in actions at law or in equity. Garlick v. McFarland, 159 Ohio St. 539, 113 N.E.2d 92, 95(3); Velkers v. Glens Falls Insurance Co., 93 N.J.Super. 501, 226 A.2d 448, 457(11). The Ford pickup truck was not a "newly acquired automobile" within the terms of MFA's policy; it was not an automobile of which White acquired "ownership" because the purported sale of the Ford by Selvidge to White was fraudulent and void and passed no title to White under § 301.210 and the cases heretofore cited in footnotes 6 to 9, inclusive. Furthermore, it is evident from the events previously detailed, that the parties themselves considered the transaction to be a nullity insofar as it undertook to legally vest any ownership of the truck in White. MFA's policy was not effective for the benefit of Hisaw at the time of the accident and State Farm's coverage, while its insured Hisaw was driving a non-owned automobile, was primary because (so far as the record discloses) there was no "other collectible insurance" on the Ford or its operator.

■ State Farm's last point is that MFA is estopped to deny liability coverage to Hisaw. This point is bottomed on State Farm's position that the facts are that MFA undertook to defend Hisaw in the Smart damage suit and took complete charge and control of that suit for twenty-one months before denying coverage, all the while knowing there was no coverage under its policy because White had not acquired ownership of the Ford truck being driven by Hisaw at the time of the accident. Of course, if these were the facts, MFA would be estopped from denying coverage. In Mistele v. Ogle, Mo., 293 S.W.2d 330, 334, this court said: "It is defending an action with *knowledge* of noncoverage under a policy of liability insurance without a nonwaiver or reservation of rights agreement that precludes the insurer from subsequently setting up the fact and defense." See also: Helm v. Inter-Insurance Ex-

change for Automobile Club of Missouri, 354 Mo. 935 (banc), 192 S.W.2d 417, where the insurer withdrew from defense of a personal injury action immediately after it learned a fact under which its policy would not afford coverage. The difficulty with State Farm's position is that the facts are not what it says. The stipulation of facts is that MFA discovered on July 1, 1966, that the Ford truck had been registered in the name of Hisaw, had never been registered in the name of White, and that MFA thereafter notified Hisaw that its policy did not cover him and that it and its counsel would withdraw from his defense. It is implicit in the finding and judgment of the trial court that the facts are that MFA had no knowledge before July 1, 1966, that White had not acquired ownership of the Ford truck and that it immediately thereafter withdrew from the defense of Hisaw. Under these facts MFA is not estopped to deny liability coverage to Hisaw.

The judgment is affirmed.

FINCH, C. J., and DONNELLY, HOLMAN and HENLEY, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

MORGAN and BARDGETT, JJ., dissent and concur in dissenting opinion of SEILER, J.

SEILER, Judge (dissenting).

I respectfully dissent from that part of the principal opinion holding that inasmuch as there was no acknowledgment or date on the used car dealer's transfer of title, White, the purchaser, did not get title to the Ford pickup truck, which his permittee, Hisaw, was driving at the time of the accident, and hence there was no coverage under White's MFA policy under its "Automatic Insurance for Newly Acquired Automobiles" provisions because White did

not acquire "ownership". I would hold that MFA has the primary coverage here.[1]

The MFA policy provided: "The insurance afforded by this policy with respect to the described automobile applies to any other automobile of which the named insured or spouse acquires ownership if it replaces the described automobile . . ."

The key words are "acquires ownership". What is meant by these words where the named insured trades his car, but the title papers on the replacement car are defective, and then the named insured, or his permittee, has an accident?

The principal opinion proceeds:

1. The sale was fraudulent and void, passing no title whatever, citing numerous Missouri decisions applying Sec. 301.210. However, I submit it can fairly be said none of these involved the question presented by this case.

2. In order for Hisaw to be covered by MFA, the car he was driving must be one of which White, the MFA insured, "acquires ownership".

3. White must own the replacement vehicle.

4. "Ownership" as used in the insurance policy means what is necessary to establish ownership under Sec. 301.210, supra. In support of this final and essential proposition, the principal opinion cites two cases, one from Ohio and one from New Jersey. The two cases, Garlick v. McFarland, 159 Ohio St. 539, 113 N.E.2d 92, and Velkers v. Glens Falls Insurance Co., 93 N.J.Super. 501, 226 A.2d 448, hold, in a liability insurance coverage situation, that where there is an attempted sale of a used automobile but title papers are incomplete, legal title will not be considered as having passed, by virtue of the statutes governing titles to motor vehicles, and so the ownership of the car remained in the seller and his policy would apply if the car was being driven with his permission (under this approach, the ownership of the pickup truck in the case before us would remain with the seller, Selvidge Auto, and their liability insurance, if they had any, would apply, if Hisaw were driving with their permission, in accord with the Missouri cases referred to in the following paragraph).

However, neither of the two cases cited involved the question of whether *the liability coverage of the purchaser's policy or that of his permittee applied, which is the question before us.* In both cases, the question was whether the purported seller's policy applied and since he had not divested himself of title by reason of failure to comply with the motor vehicle title statutes, he was still the owner and his policy applied. Sabella v. American Indemnity Company, (Mo.Sup. banc) 372 S.W.2d 36, and Allstate Insurance Company v. Hart-

[1.] The general rule in Missouri (unless altered by policy provisions or special circumstances) is that the policy insuring the liability of the owner of a described vehicle has the first and primary coverage. Powell v. Home Indemnity Company (CCA 8) 343 F.2d 856; Fidelity & Casualty Co. of New York v. Western Casualty & Surety Co., (Mo.App.) 337 S.W.2d 566, and State Farm Mutual Auto Ins. Co. v. Mid-Continent Casualty Co., (Mo.App.) 378 S.W.2d 232. The rule of thumb is that the primary insurance follows the owned car, or, to put it another way, the insurer of the named insured to whom the automobile is non-owned is secondarily liable, generally speaking.

The reasoning is that the coverage written on a particularly described and owned automobile in the standard automobile liability policy is designed primarily to afford coverage for liability arising out of the operation of that automobile by the insured or his permittee. On the other hand, the coverage provided by the standard policy for one operating a vehicle other than the one described in his policy is intended mainly to avoid a liability exposure during incidental use of other vehicles. Olson v. Hertz Corporation, 270 Minn. 223, 133 N.W.2d 519, 523. So in a situation where both policies could apply it is logical to look first to the policy which provides coverage for broad user of the particular vehicle involved in the accident, rather than to the policy which provides coverage only as incident to covering the driver on his own car.

# 404

ford Accident and Indemnity Company, (Mo.App.) 311 S.W.2d 41, are Missouri cases to the same effect. None of these cases involves an interpretation of the meaning of the words "acquires ownership" as applied to the factual situation before us and it is submitted these cases do not solve our problem.

Our case necessarily involves interpretation of the words "acquires ownership" and the principal opinion construes or interprets "ownership" as meaning what is necessary to meet the requirements of Sec. 301.210. There is nothing before us by which we can say with assurance that this is the meaning intended by the parties thereto when the MFA insurance policy was written. On the contrary, it is much more reasonable and in keeping with the likely intent of the parties that what is meant by "acquires ownership" is that if the named insured acquires what the ordinary man would consider ownership for the purposes at hand, that meets what the parties intended. Both Couch and Appleman support this view: 12 Couch, Insurance 2d Ed., Sec. 45: 187 p. 237: "'Ownership' of the automobile for the purpose of a replacement clause refers to the true ownership of the automobile, and means such ownership as an ordinary man ascribes to his own, the property right which he holds as owner, the right of user, and interest in its protection which goes with a sense of ownership." 7 Appleman Insurance Law and Practice, Sec. 4293, p. 91: "Where the policy states in such provision that coverage is afforded when the insured acquires 'ownership', it means such ownership as the ordinary man would contemplate by such term, that is, the right of user and such an interest in its protection that goes with a sense of ownership . . ."

In the case before us, White traded in his 1961 Rambler, took delivery of the 1958 Ford pickup truck from Selvidge Auto, and received the title papers from Selvidge. These were in order, except for lack of an acknowledgement and this was because it was at night when the notary was absent. White was told by Selvidge, however, to take the certificate to a particular notary who knew his signature and would notarize it. There was nothing, therefore, suspicious in what occurred or to make White apprehensive as to the genuineness of what he was getting. White took possession of the pickup truck and put his Rambler license plates on it. His rights in it were superior to anyone else. The pickup truck was the only vehicle he had and he proceeded to use it. Did not the parties intend that once the named insured had gone this far in replacing his first automobile with another one that the "acquires ownership" part of the automatic coverage for newly acquired automobiles clause had been brought into operation and that he and his permittee would be protected against liability arising out of use of the replacement vehicle?

What is the purpose of the automatic coverage for newly acquired automobile clause? Appleman says it " . . . is to give coverage to persons who are already insured with the company in question upon acquiring a new vehicle. The coverage extends to the new acquisition when it replaces the sole automobile owned by the insured . . . ", 7 Appleman, Insurance Law and Practice, Sec. 4293, page 84. Blashfield says, "An automatic insurance provision is for the benefit of the insured, and its purpose is to extend coverage to the person already insured with the company in question in respect to the operation . . . of another automobile acquired by him, which is not described in the policy, as a replacement for the automobile originally covered . . . "

Blashfield goes on to say, "In construing such a provision, it must be kept in mind that the public has an interest in having automobiles covered by liability insurance, and its purpose is to broaden the coverage and not to restrict it", Blashfield, Automobile Law and Practice, 3rd Ed., Sec. 316.3, pp. 656–658.

In Beck Motors, Inc. v. Federal Mutual Insurance Company, (Mo.App.) 443 S.W.2d 200, 203, the court said: " . . . Its purpose is to permit the automatic extension of coverage to a car not specified by the policy, where that vehicle is acquired to replace the vehicle described . . . "

The clause also provides a good sales argument for the insurance company for purchase of the policy in the first place and it induces the insured to keep his insurance with the original company when he trades cars, instead of going elsewhere, California State Automobile Association v. Dearing, 259 Cal.App.2d 717, 66 Cal.Rptr. 852, 856.

In American Indemnity Co. v. Davis (CCA 5), 260 F.2d 440, the question of whether there was coverage under the automatic coverage for newly acquired automobiles arose with respect to a replacement car which was jointly owned by the named insured and his son. The court came to the conclusion the term "ownership" as used in the policy was ambiguous and must be construed most favorably to the insured, saying at 260 F.2d 442, " . . . Since 'ownership' in its literal sense includes joint as well as sole 'belonging', the use of the more general term 'ownership' comprehends the qualified terms 'sole' and 'joint' ownership. The term is ambiguous . . . "

In Quaderer v. Integrity Mutual Insurance Company, 263 Minn. 383, 116 N.W.2d 605, 608, the court construed the words "owner" and "ownership" as used in the automatic coverage for newly acquired automobiles clause, saying as follows: " . . . The pivotal question is: What meaning should be given the words 'ownership' and 'owned' selected by the defendant in these policy provisions and under the facts of this case?

"In construing the terms of the policy, it must be kept in mind that the public has an interest in having automobiles covered by liability insurance. Further, it is well settled that any ambiguous terms of an insurance policy are construed in favor of the insured and against the insurer who is charged with having chosen the language of the policy. In their context the terms 'ownership' and 'owned' are ambiguous. It is not clear whether they mean registered owner, or one having legal title to the vehicle, or simply one who may be exposed to liability as a registered owner pursuant to statutes governing motor vehicle registration and the Safety Responsibility Act. Thus the policy should be construed to effect coverage if this can be done without violence to its plain language and underlying purpose."

In Powell v. Home Indemnity Company, supra, fn. 1, a case involving Missouri law, the court considered the meaning of the word "owner" in an automobile liability insurance policy and said, 343 F.2d l. c. 859–860: " . . . The trial court in construing the word 'owner' must take the meaning most favorable to the insured . . . The plain and reasonable meaning of the word as applied to motor vehicles includes not only absolute estates but also includes estates less than absolute . . . " Under this view, White's less than absolute estate in the pickup truck would be sufficient to meet the "acquires ownership" language of the MFA policy.

Siemer v. Schuermann Building & Realty Company, (Mo.Sup.) 381 S.W.2d 821, 826, does not involve an insurance contract, but it did involve a contract with the words "persons owning such lots" and the court discusses the meaning of the words "owner" and "persons owning" as follows: "The term 'owner' or the equivalent phrase 'person owning' does not have a fixed definite meaning. In its restricted sense, it means 'legal owner'. In a broader sense, it means any persons beneficially interested in property . . . "

I see no sound reason why the words "acquires ownership" as used in the MFA policy must necessarily, or should be, equated with ownership or title as used in the Missouri motor vehicle registration statutes. As pointed out in 28 Mo.L.R. 121,

"Titles to Used Automobiles in Missouri", our statute, Sec. 301.210 " . . . represents Missouri's attempt to curb a problem which has, become increasingly serious in this highly mobile day and age: the theft and fraudulent sale of used automobiles . . . " In that field, of course, no one disputes the soundness of holding that a transaction involving purchase and sale of a used automobile is invalid unless the statutory requirements are met. But no such aspect is involved here. To hold that White "acquires ownership" of the pickup truck in the sense intended by the automatic coverage for newly acquired automobile provisions of the MFA liability policy in no way promotes the theft and fraudulent sale of used automobiles. To hold otherwise on the basis that Sec. 301.210 governs is to make a mechanical application of an inflexible rule developed to meet a different problem, where there is no basis for saying the parties had any such intention such rule should govern their insurance contract. In fact, the reasonable intentions on both sides are to the contrary.

As said earlier, deciding this case necessarily involves construction and interpretation of the words "acquires ownership." If the words are ambiguous, as it seems they are, there is no way to avoid facing the fact that they are and the consequence that they must then be construed most favorably to the insured. As I have attempted to point out, it is quite reasonable to interpret "acquires ownership" as including what White had acquired with respect to the pickup. To interpret "acquires ownership" as meaning that White must have full technical title to the vehicle is actually to construe the words most favorably to the insurer—it produces the narrowest possible coverage.

While it is not our business to remake insurance contracts, as stated in Brugioni v. Maryland Casualty Co., (Mo.Sup.) 382 S.W.2d 707, 710–711, " . . . On the other hand, an insurance policy being a contract designed to furnish protection will, if reasonably possible, be interpreted so as to accomplish that object and not to defeat it, and, if terms of the contract are susceptible of two possible interpretations and there is room for construction, the provisions limiting or cutting down on the coverage of the policy, or avoiding liability therefor, will be construed most strongly against the insurer . . . "

In the case before us, as it turned out, Hisaw, the driver of the pickup truck, had insurance which applied in case White's did not. So the injured plaintiff was paid and Hisaw was protected. But suppose Hisaw had had no insurance and suppose further that Selvidge, the used car dealer, was financially irresponsible and had no insurance. Under the majority opinion, there would be no insurance available and it seems to me this result would be an unjustified windfall for MFA and completely at war with what the parties reasonably intended as to insurance coverage.

Under the principal opinion, if a man were to trade his car at a used car dealer for a used car, and if when the used car dealer turned over the assigned certificate of title to him it was somehow defective (assume the notary public simply overlooked notarizing it), then if the purchaser had an accident while driving his newly acquired car home that same day, or if he turned it over to his son to drive it home and the son had an accident en route, there would be no liability coverage under the purchaser's policy. I do not believe the insurance company had any such intention when it wrote the policy, no do I believe the insured expected there was any such technical loophole.

There is an additional ground on which it should be held that the MFA, not the State Farm, policy provides the primary coverage for Hisaw. I refer to the well-established proposition that ownershp is irrelevant when considering the coverage of a liability policy, a proposition which the majority opinion rejects on page 7 as "not

germane" in the case. The reasoning is that for Hisaw to be covered by the MFA policy, he had to be using a vehicle described in the MFA policy with White's permission and the pickup truck could not qualify unless White owned it.

The implication seems to be that ownership would be irrelevant if White himself had been driving, but not where White's permittee is driving. However, I see no way that White could be covered and White's permittee not covered, because under the terms of the MFA policy the insurance afforded with respect to the described automobile (the Rambler) applies to any other automobile of which the named insured acquires ownership if it replaces the described automobile. So if White were covered, certainly his permittee is covered, because the policy covers anyone using the described automobile with White's permission and the same is true as to a newly acquired automobile.

In Hall v. Weston, (Mo.Sup.) 323 S.W. 2d 673, we extended coverage to the named insured's *permittee*, who was driving a *replacement* tractor and trailer. The trial court had directed a verdict against the insured, one ground being that the insured had no insurable interest, on the theory that the insured failed to prove that he had acquired a properly assigned certificate of ownership to the replacement vehicle under the statute, Sec. 301.210. The insurer was relying on Kelso v. Kelso, (Mo. Sup.) 306 S.W.2d 534. The court said this about the Kelso holding, 323 S.W.2d 1. c. 679: " . . . In any event, however, the cases cited in the Kelso case to support the proposition that one who does not acquire title to an automobile in accordance with the provisions of Section 301.210 has no insurable interest therein were cases involving damage to or loss of an automobile by fire . . . The Kelso case should not be considered authority for the proposition that a named insured needs to have an insurable interest in an automobile in order

to be covered by a policy insuring him against liability rather than against loss . . .

" . . .

"Our present holding is limited to the instant situation, viz., one wherein a policy of automobile liability insurance insures only against liability for damages by reason of bodily injury and property damage arising out of ownership, maintenance, or *use* of the automobile, and for medical payments, and further provides, as does the instant policy, that 'insured' includes the named insured and *any person using the automobile with his permission. We hold in the described situation that proof that an automobile was owned by named insured or that he had an insurable interest therein is not necessary.* Ownership under those circumstances is irrelevant on the question of liability . . . " (emphasis supplied).

The majority opinion refers in footnote 10 to the Hall v. Weston case as involving the "Named insured under policy insuring against liability instead of loss", but I respectfully point out that the coverage in Hall v. Weston was extended to the named insured's *permittee*. The named insured, who had been named jointly as a co-defendant with his driver (the permittee) in the original damage suit, had been let out in the jury trial—the jury found in his favor. The judgments which were sought to be collected were against the driver-permittee alone. The principle announced in Hall v. Weston that it is irrelevant in these circumstances whether the named insured had ownership of the replacement vehicle would seem very much germane to the question before us. If ownership by the named insured was irrelevant in Hall v. Weston, where coverage was extended to the named insured's permittee, I fail to see why it is not equally irrelevant here, where coverage is sought to be extended to the named insured's permittee driving a replacement vehicle. It

seems to me that the majority opinion conflicts in this respect with Hall v. Weston.

One final point: the majority opinion refers to the fact that 22 days after the accident, Hisaw purchased the pickup truck from White, and he and White had Selvidge execute another "Reassignment by Registered Dealer" to Hisaw and Hisaw thereafter was issued a certificate of title on the pickup truck. The majority opinion says this makes it evident " . . . the parties themselves considered the transaction to be a nullity insofar as it undertook to legally vest any ownership of the truck in White." In my judgment, these events occurring after the accident, when the rights of the parties as to coverage had already become fixed on whatever the facts were when the accident occurred, cannot operate to affect the rights of the parties. We do not know what motivated Hisaw to buy the truck after the accident. Presumably it was damaged and perhaps Hisaw felt morally obligated to take it off White's hands. Hisaw evidently was somewhat negligent in his driving of White's pickup because $4,000 was paid on Hisaw's behalf to the injured plaintiff by the insurance company on a policy which had a $5,000 limit. Also, as a practical matter, it undoubtedly was much simpler for Hisaw and White to forget the attempted transfer of title to White and have Selvidge start over with a new reassignment of title to Hisaw, than to correct the assignment to White and have White go through the steps to get a new title and then assign that to Hisaw. I do not believe the way the parties disposed of the damaged pickup truck after the accident bore any significance to them or to others as to whether Hisaw had coverage under the MFA policy, or whether White had acquired ownership of the pickup truck in the sense the words were used in his policy.

As earlier stated, I would hold that MFA has the primary coverage here and that State Farm does not.